Thank you. Our third case for this morning is Newman v. Metropolitan Life Insurance. Mr. Duncan. Thank you, Your Honor. Counsel, may it please the Court. Words matter, and the words that Metropolitan Life used to advertise, market, and describe the reduced pay at 65 premium payment option promised Margery Newman a fixed post-age 65 premium amount. But what did it promise her? Now, Mr. Duncan, based on the policy and representation that, you know, in the brochure, was it her understanding, Ms. Newman's understanding, that the premiums could increase prior to her reaching the policy anniversary date after age 65, but that after that date, the amount would be fixed at half of the premium at that age. That's precisely what she believed, Your Honor. She believed that she was purchasing and, therefore, receiving a benefit that began when she turned 65, and that's when she would start to realize that benefit. And the language that MetLife chose to use in the marketing materials advertising this premium payment option referred to a specific amount. It says, by paying more than the regular premium amount you would pay each year up to the policy of your pre-age 65 premiums thereafter. Half the amount of your pre-age 65 premiums refers to a specific amount. So, for example, if her pre-age 65 premium had been $4,000, this would, therefore, read and conveys to her, you would pay $2,000 thereafter. And so there… Well, you're emphasizing the word, your. And, of course, we can deal with the fact that this is in the brochure, not actually in the policy. But you're emphasizing the fact that a rational person could read your pre-age 65 premiums as assigning a value to the number N, you know, as to whatever that individual's premiums were the day before they turned 65, and then that that gets frozen. The problem is this language is not actually in the policy. And so what I want you to address is what in the policy would make somebody think that the promise is to keep N fixed, to keep the number, the amount fixed, as opposed to a promise always to charge people 65 and over one-half of whatever the policy may be, whatever the amount may be? Well… Because I think they're doing that. As Your Honor knows, the policy itself is very quiet on what reduced pay at 65 means. And the only language related to the post-65 premium amount suggests on and after age 65, on and after the policy anniversary at age 65. So it's on and after. But that language cannot be read alone or ignoring the language in the policy, or rather the language… And isn't there that one little place in the policy where it says… So you have it at page 34 of your brief. In the schedule of benefits, you have selected the following flexible premium payment option. Before policy anniversary, they give a number, $3,231.93. On and after the policy anniversary, $1,615.97. So you're saying that she read that as that's what your payment is going to be, the $1,615. On and after policy anniversary at age 65. But if I may take a moment… Even though they say in lots of other places in the policy, but we might raise the premiums. Absolutely. And we don't discount that. They did say, or reserved the right to increase premiums in numerous other places in the policy. But the reason that Ms. Newman, and likely many, many others, read it the way that she did is because of what's stated in the marketing materials. And the law requires that an insurance policy, separate and apart from all other contracts, but an insurance policy must be read using the reasonable person standard in the position of the insured. And that's critical here. Because the position of the insured, Marjorie Newman, is established by what she read in the marketing materials. And if you read the policy in isolation, if you read the policy in isolation, I don't think anybody knows what reduced pay at 65 means at all. But if we adhere to the standard that the law… This is the only place in the policy it's mentioned, right? Correct. Yeah. And so you don't know if it's a one-time reduction, you don't know if it's a permanent reduction, you don't know if it's a percentage reduction, or if it's a reduction just in an amount of $1,800 and some odd dollars. But if we're going to stay true to the standard that's required when interpreting insurance policies and read it using a reasonable person standard in the position of the insured, we have to take into consideration what Newman read in those marketing materials. And those marketing materials reasonably promised her that she would be paying a fixed post-age 65 premium amount. What's also important is if we look at those and also adhere to the law and look at the totality of the circumstances. So if we look at the context in which she was informed about reduced pay at 65, above reduced pay at 65 it says double pay first year option. So reduced pay at 65 is one of four options. The first one promises a fixed percentage reduction in the regular premium amount for the life of the policy. The two below it suggest or inform that you can pay off your policy in its entirety, completely avoiding premiums at some point down the line. And then reduced pay at 65 is couched in between those. And that's part of the reason why she believed that she was securing a reduced or a fixed reduced post-age 65 premium amount. In addition, it's... Even though the fine print footnote says don't believe anything in this brochure if it's different from the policy. Well, that's what MetLife would have you believe that that footnote says. But that's not what the footnote says. The footnote says this brochure is intended to provide a general overview. General overview doesn't mean don't rely on it. General overview doesn't mean, hey, you better look skeptically at the policy that you eventually received after you complete this transaction to make sure that everything is absolutely consistent. Oh, and I'm glad you mentioned that because I wanted to ask you about this 30-day lookover opportunity once she really does have the policy. How does that fit in in your view? Well, Your Honor, two points. Number one, Illinois courts have repeatedly rejected a return policy acting as a defense to Illinois Consumer Fraud Act claims. It would render the entire act meaningless. That's number one. And number two, the transaction... Do you think it undermines your breach of contract theory? No, I don't think it undermines my breach of contract theory because the contract had already been completed at that point. But they say it was sort of subject to unwinding for that 30-day period. Whether it's subject to unwinding or not, the contract had been agreed to and entered into. Coverage had been bound at that point. That's number one. The other point worth making is that the 30-day review policy is rendered meaningless by the ambiguity of the policy itself. She would have no reason to think that the language of the policy was inconsistent with what she read in the marketing materials. It wasn't a self-correcting document that said, hey, by the way, your premium rates are subject to change in the future, or on and after policy anniversary at age 65, subject to future rate increase. Having her expectations set by the information that was contained in the marketing materials, it's in that context that she read the policy itself, and she didn't believe that there was anything different, or that there was anything worth being concerned about or any reason to exercise the 30-day review period and return her policy. The first time that she became aware that the marketing materials and policy meant something different than what she believed was when MetLife levied a 102% rate increase on her policy premiums two years after she had turned 65. Now, there had been an earlier adjustment of some kind? Did they explain that away somehow? Well, Your Honor, frankly, we're here on a 12B6 motion, but the evidence, if given a chance to explore the evidence, the evidence is going to show that that wasn't a rate increase. That was a rate correction. There's extensive correspondence, and there's a distinction. Essentially, MetLife said, hey, we miscalculated your rate. Here's what it should have been. Here's what it's going to be. We're not going to ask you to pay back what you should have been paying. It wasn't this class-wide rate increase that they eventually levied, and in the context in which it was imposed, would have had no reason to advise or alert Newman to the fact that the reduced pay at 65 premium payment option was anything other than what she had originally believed it to be. Can you tell me what a class is here, a class-wide rate adjustment? Who's a class? Well, I can tell you now at this point, after having gone through a motion to dismiss an appellate briefing, that a class is everybody who purchased a long-term care insurance policy through MetLife, regardless of what premium payment options you may have purchased or benefits you may have been promised. So it's the type of policy that may be long-term. Long-term care is nursing homes and stuff, right? Among other things, yes, Your Honor. But it's not defined in the marketing materials. It's not defined in the outline of coverage. It's not defined in the policy itself. And so it was left to Newman to determine what defines the class. Now, of course, the common definition of class is a group defined by a common characteristic, okay? And she believed herself to be made up of characteristics that included having a frozen premium beginning at age 65. And so, again, what you end up with is a specific promise that MetLife made to Newman and a general right that they reserved elsewhere in the policy that goes unresolved. And the law requires that if that creates an ambiguity, it be resolved in Newman's favor. Alternatively, if those are two competing provisions in the contract, the specific provision related to Newman's post-age 65 premiums would control over the general warnings and admonitions about future class-wide rate increases. Okay. I'll reserve the rest of my time for rebuttal. Thank you. Mr. Surface. Thank you, Your Honor. Good morning. May it please the Court. Mr. Duncan is right. Words matter. And the words in the contracted issue are very, very clear. But why isn't that chart very, very clear, too, that tells her this is what you're going to have to pay on and after the policy anniversary at age 65 in the policy, in the schedule of benefits, because she selected the reduced pay at 65 premium? It doesn't say, or whatever one-half of any future rate is. No, Your Honor, it doesn't use those words. But the page Your Honor is referring to is the schedule of benefits. Exactly, and that's the only place in the policy where it implements her choice of reduced pay at age 65. Why isn't this at least ambiguous so that she as the insured gets the benefit? It's not ambiguous for a range of reasons, Your Honor. First, under Illinois laws, the Court knows we need to look at the contract in its entirety, not just one provision. But I didn't see a single sentence in this contract that said if you've selected the reduced pay at 65 premium, what we're promising is that you'll pay one-half of the existing current premiums, not that we're promising to freeze your premium amount to what it was when you turned 65. Your Honor, the reduced pay at 65 option says here's what your premium will be on and after. And after? On and after, right. And the contract, looking at it as a whole, specifically reserves to MetLife the right to raise premiums at any time in any amount. But it doesn't say that, though. Judge Rover has a question. Yeah, the brochure provides that after 65, she would pay half the amount of her pre-aged 65 premium. So it references a specific amount at a fixed point in time, namely half of the amount of whatever her pre-aged 65 premiums were. How can that number ever increase, given that once she is 65, her pre-aged 65 premiums can never change? I've really had a problem. Thank you, Your Honor. I don't understand. They can change. The brochure speaks to that. Not the pre-aged 65. That's a matter of historical fact. There's a number that corresponds to what she was paying before she turned 65. Yes, Your Honor, there is. And that's not going to change. We're not going to go back in time. No, but when the policy was issued, when the policy was issued, MetLife had reserved to itself the right to raise the premiums at any time. And the brochure does not speak in terms of Ms. Newman's rates being locked in permanently. It simply says thereafter. It says your premiums. Your premiums, right, thereafter. It doesn't say forevermore. It says thereafter. And as Ms. Newman included in her briefing, the definition of thereafter does not have a permanent connotation. Instead, it means simply afterward. And MetLife did reduce her premiums by half at her age 65 anniversary, and they remained at that lower level thereafter for a couple of years before being raised, and then when they were raised, they were raised by half, entirely consistent with the language in the brochure. And the brochure specifically says, as Chief Judge Wood pointed out, that it is an overview and that the policy is what controls the relationship. Ms. Newman received the policy and had a 30-day period from the time she received the policy to review its terms. It's hard for me to see what would have alerted her reading this policy, not to understand this special payment option for which she paid extra money to MetLife. She complied at all times with whatever it was you were asking from her pre-65, so she understands that she has elected to make special payments for a special option. And I don't see any language in the policy that would alert her to this qualification. Your Honor, the language begins on the first page of the policy. But that's for everybody. She's in a special category. So ordinary people, rates can go up at any time, but if you've agreed to pay MetLife this extra money, you're in a different class. Well, Your Honor, with respect, that's not what the policy says. The policy says on the first page... The policy is ambiguous. It just says we can raise rates when we want to, but it doesn't say anything. Suppose somebody took one of the options to prepay in its entirety. Under your reading, does that mean MetLife could go back to that person and say, oh, well, we've actually decided we want to charge you more for the long-term care, so here's a bill? No, Your Honor. I don't know what the language would be of that. Precisely. So that special option for payment has consequences going forward, and you can't charge them more, even though you reserve all over the place in the policy the ability to change your rates. If the language had been changed, yes. But here, Your Honor, in the reduce pay at 65 option language, it does not say your rates are permanently locked in once they are reduced at your age 65. It simply says on and after, and it says that on a page that has an effective date. Could you put this in context? Where is the full language of that clause? The clause is discussed. The reduce pay option is discussed on the schedule page, and then the other language in the policy... Discussed in the schedule page, or just we have this little thing that says on and after? It's not really discussed, is it? The four lines that describe the reduce pay option. That provision provides absolutely no explanation as to the details of the reduce pay at 65 option. And in fact, to me, appears to be nothing more than an example of what the post 65 premium would be given the current premiums. How is that inconsistent with the representation in the brochure that the post age 65 premium will be a fixed amount? Well, there is no representation in the brochure that it will be a permanent fixed amount, Your Honor. And the language in the policy that relates to the reduce pay option is on the schedule page, the four lines the court has pointed out, and then the language in the policy that describes premium. Assume we don't have a physical copy of the policy right in front of us. Where is it in your brief? In our brief, it's in the section discussing the ambiguities. It's where we describe on page 14 of the policy the discussion of premium. 14 of the policy or 14 of the brief? Yes, of the policy. Where is it in your brief? May I pull my brief and I'll tell you? Sure. Okay. Your Honor, it's on page 9 of the brief. It begins at the bottom of page 8, and then it carries over on to page 9. That's the first place, I believe. But it said, I mean, this is back to our other discussion,  it just says we reserve the right to change premium rates on a class basis. Premium rates are subject to change. But she has signed up for something different. I am asking for where is the language in the policy, the full language in the policy describing the reduce pay at 65 option. I'm not asking for other language in the policy. The contract language that explains the reduce pay at 65 option includes the schedule of benefits, but it also includes the other places in the policy. Could you tell me where it is? There isn't any other place that specifically refers directly to the reduce pay at 65. So your brief doesn't quote the critical language of the policy anywhere? It does, Your Honor. It quotes all the critical. Where? Beginning on page 9. But what you're telling us is that the only mention in the policy of whatever the reduced rate option is is in the schedule of benefits. Well, the contract language says it. That's the only time it actually utters the words reduced rate payment option or whatever they are. That is true, Your Honor, but the contract language. Right, so there is no explanation in the policy of what this particular payment option is. There is an explanation of how the premium works for every policyholder, and there is no qualification in the reduce pay at 65 option language that would say to the reader that the other provisions of the policy relating to premium do not apply to someone who has that premium. Why wouldn't a sensible person read the words on and after policy anniversary at age 65 to mean that's what I'm going to pay on the anniversary at 65 and after the anniversary at 65? Why isn't that at least a reasonable reading? Because of all the places in the policy that reserve to MetLife the right to raise premiums at any time and because of where. If you didn't adopt the reduce pay option, sure, but if you did, what has MetLife sold? MetLife has sold. That's a great question, Your Honor. Ms. Newman has received the benefit of her bargain. She pays half of what she would otherwise pay because she has the reduce pay at 65 option. If I can go back to Your Honor's. But we don't know she would have bought this insurance product if she had actually known that this is what MetLife is doing. Well, she had every reason to know, Your Honor, in part because the place in the policy where the reduce pay at 65 option exists is the schedule page. That's the only place, right? And the schedule page says that it has an effective date. Right below the effective date, it says again in bold all capitalized letters that this schedule page replaces previous schedules of benefits. Fine. So she locks it in on a particular day. I mean, I don't see any inconsistency with her view in the fact that there's an effective date. There's an effective date on the schedule page, and then in 2012, before she turned 65, she received another schedule of benefits that changed all the premium numbers. Right. So she wasn't 65 yet. That's what all the rest of the language in the policy should have alerted her to. It should have alerted her to the fact that premiums could be raised at any time, not just before she was 65. There's one spot in the policy in the contingent benefit upon lapse endorsement, which is referred to on page 11 of our briefing, where the insured is placed on notice, not only that her premium rates may go up, but that they may go up by as much as 200%. They may go up at her age 90 or later. And so Ms. Newman, any reasonable person receiving this contract who had selected the reduced pay at 65 option, was on ample notice that MetLife has the right to raise premiums at any time in any amount. What would it have cost MetLife to put in a paragraph in the policy explaining these various options that the brochure discussed? If MetLife had wanted to write its policy that way, certainly nothing prevented it from doing so, but it didn't. But MetLife did include four different notices, including on the first page in bold all capitalized letters. Well, we've had this discussion before. I understand that's your position. Thank you, Your Honor. The policy does reserve the right to MetLife to raise premiums in four different places in unequivocal terms, and there's nothing in the reduced pay. Yes, the policy provides. Here I come. Oh, gosh. The policy provides that premiums can increase at any time. Yes, Your Honor. But how is that inconsistent with the brochure? For persons with the reduced pay at 65 option, premiums would indeed increase until they reached 65. And at that time, their premium would be tied to half of the pre-aged 65 premium. Where in the policy is that precluded? Well, Your Honor, that's not what the brochure says. The brochure does not speak to the company's right to raise premiums, and it does not speak in terms of permanence with respect to the reduced pay at 65 option. Instead, it simply says that at her age 65 anniversary, she will pay half of her premiums thereafter, and that is exactly what happened in this case. Ms. Newman's premiums were reduced by half, and they stayed there for the next two years before being increased again by half, which is plainly permitted by the contract language. Well, the way I see it is under any of these, you know, under that reduced pay at 65 provision, she faced the real possibility of premium increases, but only until she was 65. But, Your Honor, that is not what the brochure says. She was paying the extra for the reduced pay at 65 option, but once she reaches that age 65 milestone, it seems to me that her premiums, according to the brochure, are set at half of her pre-aged 65 premium, and I don't see that being inconsistent with either the policy language that premiums could increase or the schedule of benefits that calculates the post-65 cost at half of the pre-65 premium. But, Your Honor's reading of the brochure is not what the brochure says. The brochure alerts the reader that it is simply an overview and that the policy controls. That's what led me to ask for where the language is in the policy, and you tell me that there isn't any. There is, Your Honor.  According to you, there is no language in the policy that defines the meaning of the 50% at 65 option. Your Honor, there is meaning in the policy for what the reduced pay option is. There is... You have not been able to point me to a clause that says, if you subscribe to this option, these are your rights under this option. No, Your Honor, the option... It ain't there. The option is described solely on the schedule of benefits, precisely using the terms reduced pay at 65 option, but the meaning is ascribed through the section of the policy that describes the rights and obligations with respect to premium, which clearly... That is Alice in Wonderland. Your Honor, it's not. The contract... I don't know how the contract could be more clear about... Oh, I do. Oh, we do. It's real easy. All right. I'm out of time. Thank you. Well, I think we understand your points, and we thank you. Thank you. So we'll see if Mr. Duncan has anything further to say. Thank you. I'll be very brief. MetLife has gone to great lengths to tell us what the marketing materials and the policy means, and when this Court considers whether or not the contract was ambiguous, the insurance policy was ambiguous, I think it warrants consideration of the multitude of ways that MetLife could have easily described what exactly it now claims it was providing Miss Newman when she purchased this insurance contract. Unless there's any further questions, I have nothing else. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.